STATE OF MAINE
CUMBERLAND, ss

RICHARD OLESEN
and MARY ELLEN
OLESEN,

Plaintiffs

v.

MAINE MEDICAL CENTER
and THOMAS MCINERNEY,
M.D.,

Defendants

SUPERIOR COURT
CIVIL ACTION
DOCKET NO. CV-07-384
*M-CUM- 9/4/20/5*

ORDER ON MOTION FOR
SUMMARY JUDGMENT

Before the court is the defendants' motion for summary judgment. The

RCVD SEP05'13 AM 8:24

defendants allege that the plaintiffs' claims are barred by the applicable statute

of limitations. 24 M.R.S.A. § 2902. For the following reasons, the motion is

granted with regard to the plaintiffs' claims for medical malpractice and denied

with regard to plaintiff Richard D. Olesen's claim for negligent infliction of

emotional distress.

BACKGROUND[1]

Defendant Thomas McInerney, M.D. became plaintiff Richard Olesen's

primary care physician in 1997. (Pls.' A.S.M.F. ¶ 30.) In 1998 and 1999 Dr.

McInerney ordered prostate specific antigen (PSA) screening for Mr. Olesen.

(Defs.' S.M.F. ¶ 1.) The PSA test screens for prostate cancer, and the parties

agree that the normal PSA level is generally under 4.0. (Defs.' S.M.F. ¶ 3.) Mr.

---

[1] The court relies on the parties' statements of fact only and not on material that
appears only in the briefs.

Olesen's PSA results were 2.8 in 1998 and 2.6 in 1999.[2] (Defs.' S.M.F. ¶ 1.) During the 1999 visit, Dr. McInerney noted in Mr. Olesen's medical records that Mr. Olesen would want yearly PSA tests. (Pls.' A.S.M.F. ¶ 37.) After 1999, Mr. Olesen continued to see Dr. McInerney for exams and a follow-up appointment between 2001 and 2006, but Dr. McInerney did not perform any additional PSA tests. (Pls.' A.S.M.F. ¶¶ 38-39, as qualified.) If Mr. Olesen had received annual PSA tests, the results would have required referral to a urologist by 2002 or 2003. (Defs.' S.M.F. ¶ 5.)

In 2006, Mr. Olesen visited a prostate screening clinic at Brighton Medical Center on his own initiative where a PSA screen was performed and the results showed a score of 17. (Pls.' A.S.M.F. ¶¶ 41-42.) Dr. McInerney referred Mr. Olesen to a urologist for a biopsy, and on January 11, 2007 Dr. McInerney informed Mr. Olesen that he had prostate cancer. (Pls.' A.S.M.F. ¶¶ 43-45.) The cancer has spread outside of Mr. Olesen's prostate. (Pls.' S.M.F. ¶ 47.) The parties dispute the timing of the spread of Mr. Olesen's cancer. (Defs.' S.M.F. ¶ 19; Pls.' O.S.M.F. ¶ 19.) Dr. Garnick, the defendants' expert, believes Mr. Olesen's cancer spread by 2003, essentially closing any opportunity for definitive treatment. (Defs.' S.M.F ¶¶ 19-21.) The plaintiffs' expert, Dr. Wein, contends that it is unknowable precisely when Mr. Olesen's cancer spread. (Pls.' O.S.M.F. ¶¶ 19-21.) Since 2007, Mr. Olesen has undergone a prostatectomy, drug treatment regimens, and radiation therapy. (Pls.' A.S.M.F. ¶¶ 46, 48.)

When Dr. McInerney told Mr. Olesen about the PSA result of 17, he felt as if he was in a state of shock. (Pls.' A.S.M.F. ¶ 52.) Mr. Olesen believes that

---

[2] Plaintiffs dispute whether Mr. Olesen's PSA results in 1998 and 1999 were normal for a man of his age and medical history. (Pls.' O.S.M.F. ¶ 1.)

Dr. McInerney's failure to order PSA testing cost Mr. Olesen opportunities for treatment and adversely affected his prognosis. (Pls.' A.S.M.F. ¶ 56.) As a result of his belief that he lost opportunities for treatment and for a better chance of cure and/or a longer and healthier life, Mr. Olesen suffered extreme emotional distress, including extreme anger and suicidal ideation. (Pls.' A.S.M.F. ¶ 57.)

PROCEDURAL HISTORY

Mr. Olesen filed a notice of claim on July 9, 2007. Plaintiffs allege that Dr. McInerney was negligent for failing to perform periodic PSA screening, failing to provide Mr. Olesen with adequate information regarding prostate screening, and failing to recommend prostate screening. (Defs.' S.M.F. ¶ 25.) On August 14, 2009, Defendants filed a motion for partial summary judgment to limit recovery to damages that resulted from Dr. McInerney's negligence committed within the three years prior to the filing of the Notice of Claim. That motion was granted on December 1, 2009.

In August 2011, the Law Court adopted the continuing negligent treatment doctrine in Maine. Baker v. Farrand, 2011 ME 91, ¶ 29, 26 A.3d 802. Following Baker, on January 10, 2012, the Superior Court granted the plaintiffs' motion for reconsideration and vacated the previous order granting partial summary judgment in favor of the defendants. On April 11, 2012, a panel hearing was held. Plaintiffs filed a complaint on April 25, 2012. On April 1, 2013, defendants moved for summary judgment.

DISCUSSION

1. Summary Judgment Standard

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.

3

M.R. Civ. P. 56(c); see also Levine v. R.B.K. Caly Corp., 2001 ME 77, ¶ 4, 770 A.2d 653. "A genuine issue of material fact exists when there is sufficient evidence to require a fact-finder to choose between competing versions of the truth at trial." Inkel v. Livingston, 2005 ME 42, ¶ 4, 869 A.2d 745 (quoting Lever v. Acadia Hosp. Corp., 2004 ME 35, ¶ 2, 845 A.2d 1178).

2. Statute of Limitations

Under the Maine Health Security Act, "[a]ctions for professional negligence shall be commenced within 3 years after the cause of action accrues." 24 M.R.S.A. § 2902 (2012).[3] Defendants argue that Mr. Olesen's disease and prognosis became fixed in 2003. As a result, they argue, no breach of the standard of care occurred within the statute of limitations period that proximately caused Mr. Olesen any demonstrable harm.

In Baker v. Farrand, the Law Court adopted the "continuing negligent treatment" doctrine by holding:

> [A] plaintiff may bring a single action alleging continuing negligent treatment that arises from two or more related acts or omissions by a single health care provider or practitioner where each act or omission deviated from the applicable standard of care and, to at least some demonstrable degree, proximately caused the harm complained of, as long as at least one of the alleged negligent acts or omissions occurred within three years of the notice of claim.

Baker v. Farrand, 2011 ME 91, ¶ 29, 26 A.3d 806. In Baker, the parties' stipulation was critical:

> The elements of duty, breach, and proximate causation are alleged by the parties' stipulations that between 2002 and 2006, Dr. Farrand 'failed to respond appropriately to abnormal [PSA] test results,' and at trial, 'Baker would offer expert witness testimony that he suffered damage as a result of the negligent acts that

---

[3] 24 M.R.S.A. § 2902 was amended by P.L. 2013, ch. 329. The changes were made after the filing of this complaint and are not relevant to this case.

> occurred within [the limitations period.] Although the stipulation describes the alleged damage caused by the acts or omissions as 'either indeterminate or negligible,' the stipulation nevertheless asserts actual loss or harm for which Baker may prove damages, some or all of which may be negligible.

Baker, 2011 ME 91, ¶ 11, 26 A.3d 806. The Baker Court distinguished Dickey v. Vermette, in which the parties "stipulated that no act or omission occurring [within the statute of limitations] was a proximate cause of [the plaintiffs'] injuries." Dickey v. Vermette 2008 ME 179, ¶ 9, 960 A.2d 1178; see Baker, 2011 ME 91, ¶ 18, 26 A.3d 806. In this case, the plaintiffs must demonstrate that Dr. McInerney committed within the statute of limitations at least one of the alleged acts or omissions that proximately caused them harm.

a. Standard of Care

Plaintiffs assert that Mr. Olesen's cancer was first diagnosable sometime in the early 2000s. (Pls.' O.S.M.F. ¶ 20.) The parties dispute the applicable standard of care. (Pls.' A.S.M.F. ¶ 40; Defs.' Rep. S.M.F. ¶ 40.) Dr. Fried testified in his deposition that the standard of care for internists, such as Dr. McInerney, dealing with male patients over the age of 50 requires the doctor to offer a digital rectal exam and a PSA test on a yearly basis. (Pls.' A.S.M.F. ¶¶ 29, 40; Defs.' Rep. S.M.F. ¶ 40.) Dr. McInerney noted in 1999 that Mr. Olesen elected to have PSA testing at one-year intervals and if he opted for such testing, it would be done. (Pls.' A.S.M.F. ¶¶ 36-37, as qualified.) Plaintiffs have raised a genuine issue of material fact regarding a departure from the standard of care within the statute of limitations period based on Dr. McInerney's failure to perform annual PSA screenings on Mr. Olesen after February 1999 and until 2006. (Defs.' S.M.F. ¶ 2.)

b. Proximate Cause

The remaining issue is whether Dr. McInerney's failure to order PSA tests after July 9, 2004 was a proximate cause of harm to Mr. Olesen. In part, the Health Security Act defines "professional negligence" as meaning: "[t]here is a reasonable medical or professional probability that the acts or omissions complained of proximately caused the injury complained of." 24 M.R.S. § 2502(7). The Law Court has stated:

> Proximate cause is 'that cause which, in natural and continuous sequence, unbroken by an efficient intervening cause, produces the injury, and without which the result would not have occurred.'
>
> Evidence is sufficient to support a finding of proximate cause if the evidence and inferences that may reasonably be drawn from the evidence indicate that the negligence played a substantial part in bringing about or actually causing the injury or damage and that the injury or damage was a direct result or a reasonably foreseeable consequence of the negligence. The mere possibility of such causation is not enough, and when the matter remains one of pure speculation or conjecture, or even if the probabilities are evenly balanced, a defendant is entitled to judgment.
>
> A consequence of negligence is reasonably foreseeable if the negligence has created a risk which might reasonably be expected to result in the injury or damage at issue, even if the exact nature of the injury need not, itself, be foreseeable. However, reasonable foreseeability does not equal causation. To support a finding of proximate cause, there must be some evidence indicating that a foreseeable injury did in fact result from the negligence.

Merriam v. Wanger, 2000 ME 159, ¶¶ 8-9, 757 A.2d 778.

Dr. Wein testified that Gleason scores can change over time but it is impossible to know the Gleason score of Mr. Olesen's cancer before diagnosis. (Pls.' O.S.M.F. ¶¶ 13, 18.) Dr. Wein testified there are other factors that impact the risk of prostate cancer metastasis. (Pls.' O.S.M.F. ¶14.) According to Dr. Wein, Mr. Olesen's disease was most likely diagnosable in the early 2000s and

6

most likely by 2002 or 2003 with PSA screening. (Defs.' S.M.F. ¶¶ 5-6, as qualified.) Dr. Wein further testified the disease was "more favorable to treatment" at that time.[4] (Pls.' O.S.M.F. ¶¶ 20-21.) Although the defendants' expert, Dr. Garnick, contends that Mr. Olesen's treatment options would have been no different in 2007 as in 2002 or 2003 (Defs.' S.M.F. ¶ 22), Dr. Wein contends that it cannot be determined when Mr. Olesen's disease spread and, therefore, it cannot be determined when Mr. Olesen's cancer was no longer amenable to cure. (Pls.' O.S.M.F. ¶¶ 20-22.)

Based on this evidence, defendants argue that plaintiffs have simply raised an issue of fact regarding an increased risk of harm, which is not actionable under Maine law. In Merriam v. Wanger, the Law Court held that expert testimony that establishes that damage is a "reasonably foreseeable risk" of a negligent act, absent expert testimony that the plaintiff's problems more likely than not would have been avoided absent the negligent act, is insufficient to establish causation. Merriam v. Wanger, 2000 ME 159, ¶¶ 9, 12, 757 A.2d 778. In Merriam, the following expert testimony was offered:

> Clearly pelvic inflammatory disease, even the classic sense, severely impairs the patient's ability to have children. If it's too far advanced and the patient is not treated, the patient will lose tubes and ovaries. It becomes abscessed. It progresses. Even if you don't lose them, the tube itself can be scarred from the infection and not be able to pass eggs. You have the ovaries on the outside, far outside. The eggs pass down the tube. If the tube becomes narrow or scarred because of the infectious process, then the egg can't get through; and so the patient cannot have children; so, you know, we don't want to be misled to thinking if somebody comes in and have the diagnosis of PID that this simply means fine, here's the antibiotic choice, let them go home.

---

[4] Dr. Wein did not testify that in the early stages of the disease, Mr. Olesen's prostate cancer was "both diagnosable and entirely curable." (Pls.' O.S.M.F. ¶¶ 20-21; Pls.' Br. at 11.)

7

If the patient has-comes in with a vaginal discharge, not too much pain, and just had a day or two of symptoms, fine, initiate some treatment and schedule follow-up. If the patient comes in with peritonitis and bent over in pain and you believe you have PID, that requires further evaluation soon, immediately. You can't-if you dismiss it, then you run the risk of a patient having permanently damaged [a] tube and ovary.

[Y]ou've got to be very serious about treating this infection. You need to have this woman in the hospital. You need to get the appropriate physicians involved to take care of her and you may stand some chance of, one, saving the tube or preventing any of the complications which can occur with a pelvic inflammatory disease and she certainly did have complications requiring repeated drainage of an abscess. He's requiring a surgical procedure that ultimately removed her uterus at some later date.

Merriam, 2000 ME 159, ¶¶ 13-14, 757 A.2d 778 (quotations and citations omitted).

Defendants argue further that Dr. Wein's statements are too vague to be meaningful on the issue of causation because an expert must explain how and why the failure to detect a disease at an earlier time caused the plaintiff harm. See McAfee v. Baptist Medical Center, 641 So.2d 265, 267-68 (Ala. 1994); Maudsley v. Pederson, 676 N.W.2d 8, 13 (Minn. App. 2004); Kava v. Van Wagner, 2009 WL 2948490 *4 (W.D. Mich., Sept. 3, 2009).

The plaintiffs have not raised a genuine issue of material fact that any negligence by Dr. McInerney after July 4, 2004 was a proximate cause of injury or damage to Mr. Olesen. Dr. Wein's opinion that the disease "was more favorable to treatment" earlier than the diagnosis is the equivalent of the expert testimony in Merriam that if the doctor had done things differently, "you may stand some chance of, one, saving the tube or preventing any of the complications . . . ." Merriam, 2000 ME 159, ¶ 14, 757 A.2d 778. The Law Court found this testimony in Merriam lacking because no expert testified that the

8

plaintiff's damages would have been avoided if the doctor had not been negligent. Id. ¶ 15. No expert has so testified in this case and unlike in Baker, the parties have not stipulated to the elements of duty, breach, and proximate causation. Baker, 2011 ME 91, ¶ 11, 26 A.3d 806.

### c. Emotional Distress

Plaintiffs rely on Bolton v. Caine to argue that their claim for negligent infliction of emotional distress survives as a separate claim apart from the underlying claim of professional negligence. Bolton v. Caine, 584 A.2d 615 (Me. 1990). Mr. Olesen argues that he reasonably, if erroneously, believed that he had lost treatment options as a result of Dr. McInerney's failure to take annual PSA screenings and that this belief caused him severe emotional distress. Defendants rely on Curtis v. Porter to argue that the emotional distress claim fails if the professional negligence claim fails. Curtis v. Porter, 2001 ME 158, 784 A.2d 18.

In Bolton, the Law Court allowed the plaintiff's claim for negligent infliction of emotional distress to continue after judgment was entered in favor of the defendants on the plaintiff's wrongful death claim. Bolton, 584 A.2d at 618. The Law Court concluded that "[a] factfinder could find it foreseeable that a patient might suffer psychological harm as the result of her physicians' breach of duty to inform her of critical information relevant to a potential life-threatening illness." Id.

In Curtis, the Law Court affirmed the judgment entered in favor of the defendant on the plaintiff's claim for negligent infliction of emotional distress. Curtis, 2001 ME 158, ¶ 21, 784 A.2d 18. The Law Court determined that the plaintiff had not shown the existence of a duty owed to her by defendant Gagne

9

that would permit the claim of negligent infliction of emotional distress to proceed. Id. The Court stated:

> Plaintiffs claiming negligent infliction, however face a significant hurdle in establishing the requisite duty, in great part because the determination of duty in these circumstances is not generated by traditional concepts of foreseeability. Although each person has a duty to act reasonably to avoid causing physical harm to others, there is no analogous general duty to avoid negligently causing emotional harm to others.

Curtis, 2001 ME 158, ¶ 18, 784 A.2d 18. The Court made clear that, unlike in earlier cases, the Court would not apply a pure foreseeability analysis to determine the existence of a duty in negligent infliction of emotional distress cases. Curtis, 2001 ME 158, ¶ 11, n.15, 784 A.2d 18. The Court reiterated, however, that a duty to avoid emotional harm to others has been recognized in very limited circumstances: bystander liability actions and when a special relationship exists between the actor and the person emotionally harmed. Curtis, 2001 ME 158, ¶ 19, 784 A.2d 18. The Curtis Court cited Rowe v. Bennett as an example of a special relationship case. Rowe v. Bennett, 514 A.2d 802 (Me. 1986); see Curtis, 2001 ME 158, ¶ 19 n.17, 784 A.2d 18. In Rowe, the Law Court held that "because of the unique nature of a psychotherapist-patient relationship, a patient may recover damages for serious mental distress resulting from the therapist's negligence despite the absence of an underlying tort." Rowe, 514 A.2d at 807.

The Curtis Court stated that when a separate tort allows a plaintiff to recover for emotional suffering, a claim for negligent infliction of emotional distress is "usually subsumed in any award entered on the separate tort." Curtis, 2001 ME 158, ¶ 19, 784 A.2d 18. The Court concluded: "although

10

negligent infliction claims are now routinely added to complaints stating a cause of action in tort, this practice is rarely necessary <u>unless the claim is made by a bystander or against one with a special relationship with the plaintiff."</u> <u>Curtis</u>, 2001 ME 158, ¶ 20, 784 A.2d 18 (emphasis added). A patient-physician relationship is a special relationship. See <u>Bolton</u>, 584 A.2d at 618; <u>Rowe</u>, 514 A.2d at 807.

The plaintiff has raised a genuine issue of material fact with regard to his suffering severe emotional distress when he learned in early 2007[5] that Dr. McInerney had not been checking Mr. Olesen's PSA levels on a yearly basis because he believed "treatment opportunities had been missed." <u>Bolton</u>, 584 A.2d at 616; (Pls.' A.S.M.F. ¶¶ 52-57.)

The entry is

> The Defendants' Motion for Summary Judgment is GRANTED as follows: Judgment is entered in favor of Defendants Maine Medical Center and Thomas McInerney, M.D. and against the Plaintiffs Richard D. Olesen and Mary Ellen Olesen with regard to the Plaintiffs' claims for medical malpractice.
>
> The Defendants' Motion for Summary Judgment is DENIED with regard to Plaintiff Richard D. Olesen's claim for negligent infliction of emotional distress.

Date: September 4, 2013

Nancy Mills
Justice, Superior Court

---

[5] The defendants deny, based on Mary Ellen Olesen's deposition testimony, Mr. Olesen's claim that he learned in early 2007 that his PSA levels were not checked annually. (Defs.' Rep. to Pls.' A.S.M.F. ¶ 54.) The defendants further assert Mr. Olesen's beliefs were not reasonable. (Defs.' Rep. to Pls.' A.S.M.F. ¶¶53, 56-57.) These are fact issues to be resolved trial.

11

D COUNTY'S CLERK'S OFFICE
L ESTATE DIVISION
RY ST
2
ME 04112

JULIAN SWEET ESQ
BERMAN & SIMMONS
PO BOX 961
LEWISTON ME 04243-0961



MARK LAVOIE ESQ
NORMAN HANSON & DETROY
PO BOX 4600
PORTLAND ME 04112-4600